UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DEENA CRISPIN,

                    Plaintiff,

v.                                                          Case No.  5:09-cv-219-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying her application for disability insurance benefits.

(Doc. 1.)  The Commissioner has answered (Doc. 11) and both parties have filed briefs

outlining their respective positions.  (Docs. 22 & 23.)  For the reasons discussed below,

the Commissioner's decision is due to be **AFFIRMED** under sentence four of 42 U.S.C.

§ 405(g).

## I.  PROCEDURAL HISTORY

On April 15, 2005, Plaintiff filed an application for disability insurance benefits

claiming a disability onset date of September 1, 2003.  (R. 16.)  Plaintiff's application

was denied initially and upon reconsideration. (R. 30, 36.)  Thereafter, Plaintiff timely

pursued her administrative remedies available before the Commissioner, and requested

a hearing before an Administrative Law Judge ("ALJ").  (R. 46.)  Plaintiff appeared and

testified at a hearing held on April 30, 2008.  (R. 630-75.)

1

The ALJ issued a decision unfavorable to Plaintiff on December 9, 2008.  (R. 13-25.)  Plaintiff requested review by the Appeals Council of the ALJ's decision on February 26, 2009.  (R. 8.)  The Appeals Council denied Plaintiff's request for review on April 7, 2009.  (R. 5.)  Plaintiff then appealed to this Court.  (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with

---

[1] <u>See</u> 42 U.S.C. § 405(g).

[2] <u>See</u> <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); <i>accord,</i> <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>See</u> <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>See</u> <u>Foote</u>, 67 F.3d at 1560; <i>accord,</i> <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12]  Fifth, if a claimant's impairments (considering her

---

[5] See Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] See 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] See 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] See 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] See 20 C.F.R. § 404.1520(b).

[10] See 20 C.F.R. § 404.1520(c).

[11] See 20 C.F.R. § 404.1520(d).

[12] See 20 C.F.R. § 404.1520(e).

3

RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide

---

[13] See 20 C.F.R. § 404.1520(f).

[14] See Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See Also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] See Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (internal citations omitted).

[16] See Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] See Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was thirty-seven years old on the date that the ALJ entered his final decision.  (R. 666.)   Plaintiff graduated from high school, attended one year of college and has past work experience as a bartender, manicurist and office manager.  (R. 24-25, 119, 636-37, 666.)  Plaintiff contends that, as of September 1, 2003, she was no longer able to work due to several disabling impairments, primary among which were chest pains, a heart condition and shortness of breath.  (R. 23.)  Plaintiff was last insured for disability benefits on September 30, 2009.  (R. 16.)

Plaintiff sought treatment at the Brooksville Regional Hospital in mid September 2003 for complaints of chest pains, lightheadedness and headaches.  (R. 187.)  Plaintiff self-reported the strength of her headache that day as a 10 on a scale on 0 to 10 and

---

[18] See Walker at 1003.

[19] See Wolfe at 1077-78.

[20] See id.

[21] See Doughty at 1278 n.2.

the examining doctor concluded that she suffered from atypical chest pains, dizziness and a vascular headache.  (R. 187-89.)  Plaintiff discharged herself from the hospital against medical advice on that occasion because she did not like the doctors that were treating her.  (R. 649.)

Plaintiff saw a cardiologist, Dr. Christos Pitarys, in October 2003 for an evaluation of the chest pains, occasional palpitations and orthostatic lightheadedness that had led to her hospital visit the month before.  (R. 303.)  Exercise stress testing demonstrated excellent exercise tolerance, but there was evidence of a very mild mitral valve prolapse.  (R. 303.)  Dr. Pitarys found that Plaintiff suffered from isolated palpitations, a history of postural hypotension with mild to moderate orthostatic intolerance, excessive fatigue and very mild mitral valve prolapse.  (R. 304.)

Plaintiff began experiencing joint pains in the left elbows, shoulders and knees, as well as chronic fatigue and trouble sleeping that were caused by these pains, in August 2003.  (R. 476.)  Plaintiff was first referred to Dr. Jeffrey Miller, a rheumatologist, by her primary care physician, Dr. Gary Levine, for a rheumatological exam on December 1, 2003.  (R. 476.)  Dr. Miller's physical examination on that date revealed a moderate amount of lymph node enlargement with decreased range of motion of the right and left elbow with some excess tissue in each elbow.  (R. 476, 479.)  Dr. Miller opined that Plaintiff likely had a mild case of sarcoid or mononucleosis and did not put Plaintiff under any restrictions as to her activities, stating that "[a]s far as I am concerned, you can do anything you feel like as long as it is reasonable and legal."  (R. 476.)  He also stated that it was possible, but unlikely, that Plaintiff had early rheumatoid arthritis.  (R. 479.)  Dr. Miller prescribed Prednisone, a cortisone medication

meant to control any joint swelling, and Motrin for Plaintiff at this visit.  (R. 476.)

Examination of Plaintiff by Dr. Jeffrey Miller again on December 19, 2003 showed definite swelling and a loss of extension of 8 degrees in the left elbow as well as a loss of extension of 5 degrees in the right elbow, which the doctor concluded was due to the presence of synovial tissue in both elbows.  (R. 474.)  A follow-up visit on January 8, 2004 conducted by Dr. Martha Stone at Dr. Miller's office showed improvement in Plaintiff's right elbow, shoulder and knee, along with a left elbow that was painful at the radial bursa to palpation.  (R. 472.)

On March 17, 2004 Plaintiff saw Dr. Miller again and reported feeling tired all the time and joint pain and weakness, while physical examination showed some discomfort in the right elbow with definite joint effusion, a puffy and tender right MCP number three, a swollen and slightly tender third left MCP and a left elbow that was -5 degrees true with discomfort.  (R. 469.)  Dr. Miller noted on this occasion that Plaintiff was showing poor response to the Prednisone and Motrin that he had prescribed, and also noted that Plaintiff was also taking Methotrexate but that Plaintiff was receiving "actually no results" from the Methotrexate.  (R. 469.)  The record, however, does not reflect whether the Methotrexate was first prescribed by Dr. Miller or another treating physician, as Dr. Miller's progress notes do not reflect a Methotrexate prescription made by Dr. Miller during this period.  (R. 469-96.)  Dr. Miller's progress notes from a visit on April 20, 2004 reflect that Plaintiff complained of experiencing pins and needles in her fingers, while the doctor's physical examination on that date revealed redness and swelling in the third MCP and both elbows, which led Dr. Miller to diagnose Plaintiff with symmetrical arthritis with definite signs of inflammation.  (R.  466.)  At that point Dr.

Miller kept Plaintiff on Methrotrexate despite the lack of response to this medication. Dr. Miller's  progress notes reflect that he was going to keep Plaintiff on Plaquenil although, again, nowhere in the record is there an indication that Dr. Miller was the original prescribing physician for the Plaquenil.  (R. 466.)

In March 2004 the Plaintiff saw Dr. Richard Gross on a self-referral and told Dr. Gross that she had been feeling well until May 2003, when she abruptly developed marked fatigue, myalgias, weakness, sweats and anorexia.  (R. 239.)  Dr. Gross's physical examination of Plaintiff's joints and extremities showed full range of motion and no inflammatory signs in Plaintiff's joints.  (R. 240.)  Dr. Gross's conclusion was that Plaintiff perhaps had chronic fatigue syndrome that was caused by a convalescent/prior Epstein-Barr virus.  (R. 240.)  Dr. Gross wrote that he would defer to Drs. Levine and Miller as to the Methotrexate and Prednisone that Plaintiff was taking, but he noted that "the patient currently does not feel that she has derived clinical benefit from these medications thus far."  (R. 241.)

Plaintiff was referred to Dr. Marc Cohen, Chairman of the Rheumatology Department at the Mayo Clinic in Jacksonville, FL, in mid-July 2004 by Dr. Levine, her primary care physician, after complaining to Dr. Levine of diffuse aching.  (R. 272.) She complained to Dr. Cohen that she was suffering from diffuse joint pain with some localization to her elbows, shoulders, knees, and fingers, morning stiffness, night sweats, generalized malaise, nasal sores, skin mottling, and poor sleep.  (R. 263.) Plaintiff also noted that she had developed some numbness and hypersensitivity in her extremities, a sensation of pins and needles in her legs bilaterally, problems with memory, anxiety, and difficulty fulfilling both her personal and professional

responsibilities.  (R. 263-64.)

Dr. Cohen noted in a letter to Dr. Levine that his rheumatological review of systems was essentially negative and that there was not much evidence for systemic inflammation.  (R. 264.)  Dr. Cohen based this conclusion on the fact that Plaintiff's joints were without synovitis, that there was some puffiness but no effusion to her knees, that there were no bony abnormalities of her hands, that her chest radiography was negative and that even her anti-CCP antibody was negative.  (R. 264.)   Dr. Cohen wrote that he could not corroborate the history of inflammatory polyarthritis that Dr. Levine had reported and felt that it was reasonable to conclude that the medications that had been prescribed by Dr. Miller had not proven particularly helpful.  (R. 264.)  Dr. Cohen suggested discontinuing the Methrotrexate, Hydroxycholoroquine (Plaquenil) and the anti-inflammatory drug (Prednisone) that Plaintiff was taking.  (R. 264.)  Dr. Cohen thought that it would be reasonable for Plaintiff to approach her problem as if she had a pain amplification problem or a reactive-type of fibromyalgia.  (R. 264-65.)

A regular visit by Plaintiff to her cardiologist, Dr. Pitarys, in early December 2004 and an echocardiogram test performed during that visit showed normal results as it related to Plaintiff's heart.  (R. 300-01.)  A cardiopulmonary test performed by another cardiologist, Dr. Mark Rolfe, in February 2005 revealed that Plaintiff was cardiovascularly fit with normals EKGs.  (R. 325, 519.)   A stress test performed by Dr. Stephen Goldman, a physician in the same cardiology practice as Dr. Pitarys, on March 15, 2005 showed that Plaintiff's exercise tolerance was normal, that ejection fraction was normal and no clinical or electrocardiographic ischemia was noted.  (R. 299.) Physical examination by Dr. Goldman on that visit showed no elbow joint effusion in

either elbow. (R. 306.)

The record reflects that Plaintiff did not see Dr. Miller again for more than a year after her visit on April 20, 2004, with her next visit not taking place until August 31, 2005.  (R. 464-65.)  On September 15, 2005 Dr. Miller wrote a note, a copy of which is in the record, that stated that "Due to the patients [sic] medical condition she is unable to walk for long periods of time.  She experiences morning stiffness and joint pain.  If at all possible it is my recommendation that her children be picked up in front of their home."  (R. 462.)  During a visit to Dr. Miller on October 5, 2005, Plaintiff self-reported that she was suffering from bilateral knee pain, generalized weakness and shortness of breath while walking, but Dr. Miller noted that her lungs did not show the wheezing associated with asthma, that cardiac disease was unlikely, and that Plaintiff was still anxious despite the Valium previously prescribed.  (R. 460.)  Dr. Miller started Plaintiff on another medication for her rheumatoid arthritis this visit, gold aurolate injections.  (R. 460.)  In November 2005 Dr. Miller noted that Plaintiff's rheumatoid arthritis had improved, and the Plaintiff self-reported that her rheumatoid arthritis had improved to the point where she was only stiff for 30 minutes or less when she first woke up in the morning, versus the 45 to 60 minutes of stiffness that she previously had experienced. (R. 451.)

In December 2005 Plaintiff self-reported 45 minutes of joint stiffness in the morning and persistent pain and swelling in the hands, wrists and knees while Dr. Miller's physical examination revealed moderate synovitis at the wrists, reduced range of motion in the right shoulder, and moderate soft tissue swelling and general joint tenderness in both knees.  (R. 441-43.)  As far as psychiatric symptoms, Dr. Miller

noted during the December 2005 visit that Plaintiff had depressive symptoms and that she self-reported feeling chronically ill, fatigued, and increased nervousness, but Dr. Miller's comment as to Plaintiff's general appearance was that she was a "healthy appearing individual in no distress." (R. 441-44.) In January 2006 Dr. Miller noted that the patient's rheumatoid arthritis had improved such that Plaintiff was only sore for 10 to 15 minutes in the morning and that her joints were somewhat better overall. (R. 435.) Physical examination on that occasion also revealed that Plaintiff had normal range of motion and no pain in her right elbow, left wrist, left hip, and right foot and ankle, although the right hip showed a slightly reduced range of motion and slight pain. (R. 434.)

In April 2006 Dr. Miller noted that the Plaintiff's rheumatoid arthritis had worsened due to her sister's death in September 2005, although range of motion was normal and no pain was present in her left knee and the right shoulder. (R. 417.) On June 14, 2006 Dr. Miller diagnosed Plaintiff with attention deficit disorder, malaise/fatigue and unspecified myalgia and myositis. (R. 407.) On June 27, 2006 Dr. Miller noted that Plaintiff was only suffering 30 minutes of stiffness in the morning and that she had normal range of motion and no pain in her hips, knees, ankles and feet. (R. 403-05.) In July 2006 Dr. Miller noted that Plaintiff's rheumatoid arthritis was unchanged, that Plaintiff had normal range of motion and no pain in her hips, knees, ankles and feet and that she had reported the Methotrexate to be ineffective. (R. 400-01, 419.) MRI scans of Plaintiff's hands and wrists performed during that visit came back completely normal except for one small erosion along the third metacarpal head in Plaintiff's left hand and a small joint effusion on the left wrist. (R. 593-96.)

11

Plaintiff underwent several consultative examinations in May 2006.  Dr. Alex Perdomo, a consulting physician, performed a physical examination and noted that Plaintiff had full range of motion of the elbows, hands, knees, and ankles, although certain painful movements were noted.  (R. 335.)  His impressions were rheumatoid arthritis by history, chronic fatigue syndrome, anxiety, depression, insomnia, history of mitral valve prolapse, history of asthma and recent left ribcage fracture.  (R. 334-35.)  Dr. Perdomo found no significant musculoskeletal functional limitations on physical examination and concluded that Plaintiff could stand/walk for six hours or sit for eight hours in an eight hour workday and that she could frequently lift up to 25 pounds.  (R. 335.)  Dr. Alexander Gimon, a consulting psychologist, also performed a psychological examination and concluded that Plaintiff had an adjustment disorder and that she suffered from some difficulties with sudden change and stress but that Plaintiff's cognitive and memory abilities were intact and her attention and concentration were direct.  (R. 338.)

On an August 17, 2006 visit to Dr. Miller, Plaintiff reported decreased breathing and complained that her left knee was giving out when she attempted to stand, but that it did so without much pain.  (R. 597.)  A physical examination performed by Dr. Miller at a visit later that same month revealed increased pain upon palpation in both of Plaintiff's elbows and swelling/tenderness in both wrists and shoulders, and so the doctor prescribed Hydrocodone for the increased pain.  (R. 589-91.)  In September 2006 Plaintiff reported to Dr. Miller that the prescribed Hydrocodone had not been working for her joint pain, and Dr. Miller concluded that her rheumatoid arthritis had worsened and that there was a new trigger point for pain present over Plaintiff's left hip

12

adductor muscles. Dr. Miller prescribed Methadone for this increased pain.  (R. 583-86.)

Dr. Miller's progress notes from October 25, 2006 reflect that Plaintiff had missed 19

scheduled appointments within the last 10 months and that her rheumatoid arthritis had

improved, with better range of motion and less pain in her elbows and shoulders from

what previously had been the case.  (R. 579-82.)  In November of that same year, Dr.

Miller noted that Plaintiff's malaise and fatigue had stabilized, and he also noted some

midclavicle tenderness that he diagnosed as unspecified myalgias and myositis and for

which he prescribed Oxycodone.  (R. 571-74.)  A follow-up visit to Dr. Miller in April

2007 showed increased range of motion and no pain in both Plaintiff's elbows, with no

pain and normal range of motion in both hips, both shoulders and both wrists.  (R. 566-

70.)  Dr. Miller also noted at this visit that Plaintiff recently had a regular cardiac stress

test that she had failed and that the pain in her joints was slightly better.  (R. 566-70.)

A stress test performed by Dr. Goldman in March 2007 revealed that Plaintiff's

exercise tolerance was poor and that she suffered from chest pain while exercising.  (R.

529.)  Plaintiff also visited Dr. Pitarys later that same month and was diagnosed with

Prinzmetal's angina with coronary spasm, systematic lupus erythematosus and mitral

valve prolapse.  (R. 629.)  A follow-up visit to Dr. Pitarys in May 2007 occurred with

Plaintiff reporting that she felt quite well without any chest pain and all her tests came

back normal.  (R.  627.)  A variety of tests performed during another visit to Dr. Pitarys

in May 2007 showed that Plaintiff suffered from a mitral valve prolapse with trace mitral

regurgitation and increased coronary vasomotor tone consistent with coronary

vasospasm of the left anterior descending artery.  (R. 543.)  In June 2007, Plaintiff

complained to Dr. Pitarys of chest tightness and dizziness with exertion and near

13

syncopal episodes and Plaintiff also asked the doctor for a handicapped parking permit since she had some difficulty walking from the parking lot to the doctor's office.  (R. 626.)

Plaintiff's next visit to Dr. Miller in June of 2007 revealed that Plaintiff's psychological complaints had worsened and Dr. Miller noted that Plaintiff's increased anxiety was not responding to the prescribed Valium but was responding to the prescribed Xanax, and that her rheumatoid arthritis had worsened.  (R. 562-65.) Plaintiff's range of motion on this visit was also more restricted and her pain much greater in both elbows than had previously been the case. She also reported that she was also now suffering from greater pain and reduced range of motion in both shoulders.  (R. 562-65.)  Plaintiff complained during an August 2007 visit to Dr. Miller that she generally felt weak and had pain everywhere, in her elbows, chest, bones, hips, knees, feet, and ankles, but she did note that she was sleeping well and often. (R. 558-61.)  Physical examination, however, noted no pain and full range of motion in both hips, ankles and wrists but did find a trigger point over the greater trochanter in the left hip and a bulge sign in the knee, neither of which had previously manifested themselves.  (R.  558-61.)  Plaintiff reported in mid-September 2007 to Dr. Miller that she was suffering from chest pains and headaches, caused by her then 18 year old daughter's murder two weeks before, a rape committed against her by her husband in June and ongoing divorce proceedings with her husband. Dr. Miller noted that her anxiety was worsening and she was still in shock.  (R.  555-57.)

On October 10, 2007 Plaintiff reported to Dr. Miller that she was receiving no relief from her joint aches and pains, and Dr. Miller's examination revealed pain in both

14

Plaintiff's shoulders.  (R. 551-53.)  Dr. Miller concluded at that visit that Plaintiff was suffering from arthrocentesis of a major joint or a bursa in her left knee.  (R. 551-53.)   A note signed by Dr. Miller and dated that same day in her medical records also opined that Plaintiff should be considered unemployable for Social Security purposes since her arthritis tended to make her stiff and the pain she suffered from that arthritis made it difficult for her to do continuous work on an ongoing basis.  (R. 554.)

   In late December 2007, Plaintiff was injured in a motor vehicle accident and Dr. Gary Levine completed an initial evaluation of Plaintiff's injuries several days after this accident.  (R. 603.)  Dr. Levine concluded that Plaintiff had suffered a number of posttraumatic acceleration/deceleration injuries in the spinal region and recommended ultrasound, electrical muscle stimulation, and chiropractic evaluation and treatment.  (R. 601-19.)  In January of 2008 Plaintiff complained to Dr. Potarys that she was incapacitated by her anginal symptoms and mitral valve prolapse, and Dr. Potarys diagnosed her with incapacitating coronary spasm with Prinzmetal's angina, the first time he had opined that Plaintiff's coronary spasm was "incapacitating."  (R. 624.) During this period Plaintiff also gained a significant amount of weight, going from 151 pounds in March 2007 to 175 pounds in January 2008, which Dr. Miller noted was due to the steroid injections that she was receiving. (R. 549, 624-29.)   In February 2008 Plaintiff reported to Dr. Miller that the Lorazepam, Paxil, Welbutrin and Prozac she was taking were not strong enough to treat her psychological symptoms and were causing her to act "meanly" to others.  (R. 548.)  On April 2, 2008 Plaintiff reported to Dr. Miller that she continued to suffer from chest pains, nonrefreshed sleep, muscle spasms at night and strange dreams.  (R. 545.)

15

## IV.  DISCUSSION

Plaintiff raises two arguments on appeal.  Plaintiff first argues that the ALJ erred in not giving substantial weight to Dr. Miller's diagnosis of rheumatoid arthritis as well as in failing to conclude that Plaintiff's rheumatoid arthritis constituted a severe impairment.  Plaintiff's second argument on appeal is that the ALJ erred in failing to properly evaluate Plaintiff's subjective complaints of fatigue, chest pain, anxiety, palpitations, and joint pain, which included hand and wrist pain.

### A.    The ALJ Did Not Err In Failing To Give Substantial Weight to the Medical Opinion of Plaintiff's Treating Physician Dr. Jeffrey Miller

Plaintiff contends that the ALJ erred both in not according substantial weight to Dr. Miller's rheumatoid arthritis diagnosis and in subsequently determining that her rheumatoid arthritis did not constitute a severe impairment.. Plaintiff contends that the ALJ "basically found that the Plaintiff's treating physician, Dr. Jeffrey Miller, misdiagnosed the claimant with rheumatoid arthritis."  Plaintiff alleges that the ALJ implicitly gave no weight to Dr. Miller's diagnosis or opinion and that since 2004 no other doctor had contradicted Dr. Miller's diagnosis or implied that Dr. Miller's course of treatment with regard to the Plaintiff was inappropriate.  Plaintiff further alleges that had the ALJ given substantial weight to Dr. Miller's diagnosis that it was due as a treating doctor's opinion then the ALJ would have concluded that Plaintiff's rheumatoid arthritis was a severe impairment.

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is

shown to the contrary.[22]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[23]   However, the ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[24]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[25]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[26]  However, a treating

---

[22] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[23] 20 C.F.R. § 404.1527(d)(2).

[24] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[25] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

[26] 20 C.F.R. § 404.1527(d).

physician's opinion is generally entitled to more weight than a consulting physician's opinion.[27]

Arthritis is the "inflammation of a joint or a state characterized by inflammation of joints."[28]   More specifically, rheumatoid arthritis is

> a generalized disease, occurring more often in women, which primarily affects connective issue; arthritis is the dominant clinical manifestation, involving many joints, especially those of the hands and feet, accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular cartilages, which become eroded; the course is variable but often is chronic and progressive, leading to deformities and disability.[29]

Plaintiff was treated by Dr. Miller for Plaintiff's joint pain from approximately December 2003 until April 2008.  (R. 476, 545.)  Dr. Miller's initial diagnosis in December 2003 was a mild case of sarcoid or mononucleosis, although the doctor did state that it was possible, but very unlikely, that Plaintiff had early rheumatoid arthritis.  (R. 476, 479.)  In April 2004 Dr. Miller noted in Plaintiff's progress notes his impression that Plaintiff suffered from symmetrical polyarthritis, while rheumatoid arthritis is not actually formally mentioned as a formal diagnosis in Dr. Miller's progress notes until November 3, 2005. (R. 457, 466.)  The ALJ concluded that Plaintiff's only severe impairment in this action was coronary artery spasm. (R. 18.)  In performing his analysis as to which of Plaintiff's various impairments rose to the level of a severe impairment, the ALJ concluded that the record reflected a diagnosis of rheumatoid arthritis but that the medical evidence did not support this diagnosis.  (R. 24.)

---

[27] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

[28] Stedmans Medical Dictionary at 33,080 (28th edition).

[29] Id.

Plaintiff contends that no other doctor contradicted Dr. Miller's rheumatoid arthritis diagnosis.  This contention is not supported by the record.  As the ALJ took great pains to note, Dr. Marc Cohen, the Chairman of the Rheumatology Division at the Mayo Clinic, examined Plaintiff and found that "I cannot corroborate the history of inflammatory polyarthritis."  (R. 21, 264.)  The ALJ also noted that Dr. Cohen's physical examination reflected that the doctor's rheumatological review of Plaintiff's systems was negative except for a small prominence of the second and third MCP joints on the right hand, some puffiness in her knees and a hint of laxity in her left knee, while the laboratory testing performed showed that there was no evidence of systemic inflammation.  (R. 264.)  The ALJ also referenced Dr. Cohen's ultimate conclusion to treat the Plaintiff's joint pain problem as fibromyalgia instead of rheumatoid arthritis.  (R. 264.)

As the ALJ pointed out, Dr. Cohen also was not the only doctor whose findings contradicted Dr. Miller's rheumatoid arthritis diagnosis or the course of treatment that Dr. Miller was following with regard to Plaintiff's joint pains.  The ALJ correctly noted that Dr. Gross's 2004 physical examination revealed that Plaintiff had full range of motion and no inflammatory signs in her joints.  (R. 21, 240.)  The ALJ also referenced Dr. Levine's January 2008 examination findings that Plaintiff had full normal range of motion and strength in all extremities and large joints, except for positive pain in the left shoulder.  (R. 23, 606-07.)  The ALJ further noted that Dr. Alex Perdomo found in his May 2006 physical examination that Plaintiff had full range of motion of the elbows, knees, hands and ankles, that the Plaintiff had no significant musculoskeletal limitations, and that she could stand/walk for 6 hours or sit for 8 hours in an 8 hour

19

workday.  (R. 22, 335.)  The ALJ also relied upon the fact that the July 2006 MRI scans

of Plaintiff's wrists and hands did not reveal anything unusual except a questionable

erosion along the third metacarpal head on the left hand.  (R. 22, 596.)

In further support of his conclusion not to give substantial weight to Dr. Miller's

opinion the ALJ took into account the lack of response by Plaintiff's subjective

complaints of joint pain to the standard drugs used in treating rheumatoid arthritis. The

ALJ specifically noted that well-proven, generally effective treatments for rheumatoid

arthritis, like the drugs Methotrexate[30] and Plaqueni,l[31] had no effect whatsoever on

Plaintiff's subjective complaints of joint pain when prescribed by Dr. Miller.  (R. 24.)  Dr.

Miller's progress notes from July 13, 2006 even reflected his own admission that "[t]he

patient's rheumatoid arthritis has not changed" and that "methotrexate not observed by

patient to be effective" despite use of those very medications that should have been

effective if Plaintiff did indeed suffer from rheumatoid arthritis, a conclusion that the ALJ

referenced and that was also supported by both Drs. Cohen and Gross.[32]  (R. 400.)

The ALJ must give a treating doctor's opinion controlling weight only if it is well-

---

[30] Methrotrexate is "a folic acid antagonist used as an antineeoplastic agent; used to treat psoriasis and rheumatoid arthritis."  Stedmans Medical Dictionary at 251,470 (28th edition).

[31] Hydoxychloroquine is sold under the trade name Plaquenil, which is the name by which it is referred to in the ALJ's opinion.  (R. 24.)  Hydroxychloroquine is "an antimalarial agent whose actions and uses resemble those of chloroquine phosphate; also used in the treatment of lupus erythematosus and rheumatoid arthritis."  Stedmans Medical Dictionary at 189,600 (28th edition)

[32] Dr. Cohen concluded that "it is probably reasonable to conclude that the therapeutic trial of Methotrexate, Hydroxychloroquine, and nonstereoidal antinflammatory drugs has not been particularly helpful" and suggested immediately dropping altogether both the Methotrexate and the Prednisone as well either lowering the dosage of Plaquenil Plaintiff was taking or also discontinuing use of that drug altogether.  (R. 164, 268.)  Dr. Gross wrote that, as to the use of Prednisone and Methotrexate, Plaintiff had "not made a correlation between these meds and relief of her symptoms so far" and that "the patient currently does not feel she has derived clinical benefit from these medications thus far."  (R. 239, 241.)

supported by objective medical evidence in the record and if it is not inconsistent with

the other substantial evidence in the record. The ALJ  may discount the treating

doctor's opinion if it is unsupported by the objective medical evidence or wholly

conclusory.  In this case, the ALJ concluded that Dr. Miller's opinion regarding

rheumatoid arthritis was not supported by the objective medical evidence and was also

inconsistent with other substantial evidence in the record.  The ALJ pointed to

examinations by four other doctors that did not support Dr. Miller's findings, the lack of

response of Plaintiff's subjective complaints of joint pain to the drugs normally used to

treat rheumatoid arthritis, Dr. Miller's own comments on that fact, and the lack of any

significant findings in the July 2006 MRI exams.  This evidence all points against

Dr. Miller's findings of rheumatoid arthritis and, collectively, constitutes substantial

evidence that the source of Plaintiff's subjective complaints of joint pain was not

rheumatoid arthritis.  The ALJ's decision not to give Dr. Miller's findings regarding

Plaintiff's rheumatoid arthritis controlling weight was supported by substantial evidence

and permitted the ALJ to discount that opinion as inconsistent with the objective

medical evidence in this case.  Accordingly, the Court concludes that the ALJ did not err

in finding that Plaintiff's rheumatoid arthritis did not constitute a severe impairment.

**B.      The ALJ Did Not Err in Evaluating Plaintiff's Subjective Complaints of
         Fatigue, Chest Pain, Anxiety, Palpitations, and Joint Pain**

Plaintiff also contends that the ALJ erred by failing to follow the Eleventh Circuit

pain standard in evaluating her subjective complaints of fatigue, chest pain, anxiety,

palpitations, and joint pain, which included hand and wrist pain.  Plaintiff alleges that

because the ALJ erred in failing to find that her rheumatoid arthritis was a severe

21

impairment that he also failed to properly follow the required framework for evaluating subjective complaints by a claimant.  Plaintiff argues that if the ALJ had found the rheumatoid arthritis to be a severe impairment then that severe impairment would constitute an underlying medical condition that could reasonably be expected to produce Plaintiff's subjective complaints of fatigue, chest pain, anxiety, palpitations, and joint pain.

In evaluating a disability, the ALJ must consider all of a claimant's impairments, including subjective symptoms such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[33]  If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[34]  While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[35] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[36]  However, a lack of a sufficiently explicit credibility

---

[33] 20 C.F.R. § 404.1528.

[34] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[35] Foote at 1562-1563.

[36] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

finding becomes a ground for remand when credibility is critical to the outcome of the case.[37]  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision,  "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."[38]

While the ALJ did not expressly state that he was applying the pain standard, a review of his decision discloses that the ALJ followed the proper framework in evaluating the credibility of Plaintiff's subjective complaints of fatigue, chest pain, anxiety, palpitations, and joint pain.

In this case, the ALJ considered whether the objective medical evidence reflected an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the fatigue, chest pains, anxiety, palpitations, and joint pain of which Plaintiff complained, and determined that it did not.  (R. 23-24.)  The ALJ also simultaneously evaluated the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which they were substantiated by the objective medical evidence, and determined that they were not.  (R. 23-24.)  The ALJ blended those two questions together but his analysis was supported by substantial evidence in the record.

As previously discussed, with regard to Plaintiff's reported joint pain, the ALJ noted that Drs. Cohen, Gross, Levine, and Perdomo all performed examinations with

---

[37] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[38] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

results that were contrary to Plaintiff's subjective complaints of joint pain; that Plaintiff's self-reported joint pain failed to respond to the standard drugs used to treat such joint pains; and that the 2006 MRI exams did not bear out the claimed joint pain.

As far as Plaintiff's complaints of chest pains and palpitations, the ALJ pointed to the fact that Plaintiff underwent a number of stress tests from 2003 to 2008, almost all of which disclosed normal findings and showed that Plaintiff had good exercise tolerance.  (R. 22, 299-306, 529, 531-41, 624-49.)   The ALJ also noted that a pulmonary CT scan in February 2005, a CT angiogram in February 2007 and EKG tests in December 2004, February 2005 and March 2007 all showed normal results.  (R. 22, 299-306, 529, 531-41, 624-49.)  According to the analysis by the ALJ, even when Plaintiff complained about the worst of her self-reported chest pains – for example in a series of four visits to Dr. Pitarys between March 2007 and January 2008 –  the physical examinations did not bear out those subjective complaints.  (R. 22-23, 624-49.)

With regard to Plaintiff's anxiety complaints, the ALJ noted that consulting psychologist Dr. Alexander Gimon concluded that the Plaintiff was fully capable of caring for herself and managing her own funds, that her thought process was rational and that her cognitive and memory abilities were intact.  (R. 22, 338.)  The ALJ also noted that Plaintiff had only mild limitations in her daily activities, since she was able to serve as a volunteer in her daughter's classroom and with her daughter's tennis team. The ALJ also concluded that Plaintiff only had mild limitations in the area of social functioning because she was able to shop, socialize with her family and attend doctors appointments.  (R. 19, 337-38.)   The ALJ further pointed out that although Plaintiff claimed to have memory and concentration problems, Dr. Gimon found during his

24

examination that Plaintiff's attention and concentration were direct and her memory was intact. (R. 19, 337-38.) Progress notes by other treating physicians also were inconsistent with the self-reported severity of Plaintiff's anxiety. For example, in June 2007 Dr. Miller noted that Plaintiff had told him that the Xanax she was taking for anxiety was working. Similarly, Dr. Potarys reported "negative" under Plaintiff's psychiatric status after her visits to him in March, May, June and November 2007 and January 2008. (R. 562, 624-29.)

With regard to Plaintiff's complaints of fatigue, the ALJ specifically considered them but found that the complaints did not square with the objective medical evidence provided in the results of Dr. Perdomo's physical examination of Plaintiff. (R. 22, 334-35.) Dr. Perdomo opined that Plaintiff could stand for up to 6 hours or sit for up to 8 hours in an 8 hour workday and lift up to 25 pounds despite Plaintiff's claims that she could barely lift a bottle of milk, could stand for only 20 minutes and could sit for only 30 minutes. (R. 22, 334-35.)

Therefore, a review of the ALJ's decision discloses that the ALJ specifically examined the objective medical evidence with respect to each of Plaintiff's subjective complaints to determine whether it reflected an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the fatigue, chest pains, anxiety, palpitations and joint pain Plaintiff complained of and whether the evidence supported her statements regarding the intensity, duration, and limiting effects of those symptoms. The ALJ concluded that in both instances it did not and each of those conclusions was supported by substantial credible evidence.

Although the ALJ concluded that the objective medical evidence did not establish

an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms Plaintiff complained of – and did not support her statements regarding the intensity, duration, and limiting effects of those symptoms – the ALJ analyzed the credibility of Plaintiff's statements regarding those subjective complaints based on a consideration of the entire record.

In this case, the ALJ concluded that Plaintiff's subjective complaints were not credible based on a consideration of the entire medical record.  (R. 24.)  As compelling reasons for discounting Plaintiff's credibility, the ALJ expressly found that there was an "almost complete lack of objective medical evidence to support the complaints of constant and unremitting pain" and that the "abundance of medications prescribed" were prescribed "almost exclusively on the subjective pain complaints of the claimant" rather than on the basis of verifiable symptoms or objective medical evidence. The ALJ further noted that "it is difficult to escape the conclusion that the claimant is greatly exaggerating the pain complaints."  (R. 24.)  As an example, the ALJ pointed to the fact that Dr. Miller had prescribed several potent opiate analgesics but that Plaintiff's subjective complaints of pain still had not responded to such strong drugs.   The ALJ went further in making this point by emphasizing that the amounts of such potent medicines prescribed for someone of Plaintiff's body weight were excessive.  While not the only reasons for rejecting Plaintiff's credibility, the ALJ considered the fact that the drugs prescribed by Dr. Miller had an extremely high street value and the fact that it was suggested Plaintiff may have manipulated her income tax returns  (R. 18, 24.)

Accordingly, the Court concludes that the ALJ articulated numerous specific reasons for finding Plaintiff's subjective complaints not entirely credible, all of which are

supported by substantial evidence in the record, and therefore, the ALJ did not err in discrediting the Plaintiff's subjective complaints of fatigue, chest pain, anxiety, palpitations, and joint pain.

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is **AFFIRMED** under sentence four of 42 U.S.C. § 405(g). The Clerk is directed to enter final judgment in favor of the Defendant consistent with this Order and to close the file.

**IN CHAMBERS** in Ocala, Florida, on September 28, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:
      Counsel of Record